Good afternoon, everyone. Welcome to our virtual Ninth Circuit here. We'll have one case for argument with this iteration of the panel, and that is Kihn v. Bill Graham Archives 20-17397. Each side has 15 minutes, and thank you for joining us by Zoom. If we have problems with the technology, we'll pause. Don't worry, but hopefully we won't, and the appellant may begin when you're ready. May it please the Court, good afternoon. Michael Elkin for appellants, and with the Court's permission, I reserve two minutes for rebuttal. This case is the poster child for why copyright infringement claims or poor candidates for class action treatment. The recordation of individual concerts taking place over several decades cannot be grouped together in some uniform construct. Audio recordings are thrown in with audiovisual recordings without regard to potentially different compulsory licensing outcomes. The composers, classes, licensing of the works cry out for individual examination, and the notion that the highly complex matter of statutory damages can be determined on a class-wide basis against this backdrop is unimaginable, unfathomable, and we submit was erroneous in time permitting. I plan to address the issue of predominance, commonality, and typicality. Turning to predominance, a core issue on the merits will be the class member's authorization for the exploitation of recordings, and we're talking here about more than 20,000 concerts comprising more than 100,000 individual works. Could I pause there to ask you about the 1101 claim? So, before we get to exploitation, I think we need to talk about whether there was consent to the recording at all, and I'm wondering what your position is on whether that consent needs to be at the time of the recording or whether it can be retroactive. Both, depending on the circumstances, I think clearly our position that consent was given at the time of the actual concerts, we're not going to know for sure unless we look at one concert on a standalone basis. You could have, for example, the front person, the lead singer, acknowledging consent, and you could have the bass player perhaps not cognizant as to what was happening, and I think that cries out for individual examination. But could I ask you, though, so under true health, at least arguably, you would need to present some evidence, if this is an affirmative defense, of consent at the time, if you want to argue that you have this individualized inquiry about consent at the time. Do you have any evidence of consent at the time, like a declaration describing an oral consent at the time of a concert or any other kind of evidence of consent at the time? Your Honor, we do, and I do believe that the arguments concerning true health, both by the district court and in the opposition brief, overlook some very key evidence that is in the record. We clearly submitted evidence in the record demonstrating support for this defense. Can you describe that or point me to it? I have aspects of it, if I may. Number one, you have 13 out of the 14 groups of concerts that specifically provide representations from the sound engineers and the concert promoters who actually did the recordation. This is in the record 4ER631, and there's language in each one of those agreements that any and all performers whose performance is captured on the recordings was fully aware of and approved of and consented to the making of these recordings. These sound engineers, Your Honor, these concert promoters had firsthand knowledge. Secondly, Your Honor, we have... I'm sorry, can I ask, so the argument is that the sound engineers represented on behalf of the artists that they consented? No, Your Honor. What happens is, at these concerts, the concert promoters and the sound engineers are the ones that actually did the recordations, and they were the ones who actually promoted the concerts, and they're the ones that interacted with the performers, and they're the ones that actually sold these groups of recordings, Your Honor, to our client. But don't we need to know whether the performers consented? Isn't that the question? Well, I think it could be, Your Honor, could be a... Of course you do, but the issue is how does that consent from the performer actually get reduced to evidence in court? We're going to have one party to those communications, which are the folks that actually signed these agreements with our clients who would testify that they actually had consent of the performers at a concert. And where is that described? What do they say about this performer's consent? It's, again, it's 4ER-631. This is one example, Your Honor, this is in the Newport Jazz Folk Festival, but there is comparable language at 4, 5ER-957, and a variety of other... I mean, the one at ER-644 says, to the best, I'm sorry, I just lost it, to the best of our knowledge and belief. That doesn't sound like a description of a very specific, we had a conversation, this is what he said. Do we have anything about a specific description of consent at the time? Well, Your Honor, just bear in mind, we're talking about groups of concerts that were actually sold to our client. So, obviously, we're talking about tens of thousands of recordings, but I think, respectfully, it would be unfair to ask the particular concert promoter or sound engineer to describe each and every interaction in an acquisition agreement. But let me just point out other evidence in the record to answer Your Honor's question, if I may. There are the joint exploitation agreements with Sony, Universal, and Warner. This is at 6ER-959, 8ER-1530. Even the opposing counsel in their brief admitted that all of these performers had exclusive agreements with the record labels at the time, and they acknowledged that these particular recordings were lawful. Not only do they acknowledge it, and we're talking about some 85% of the music industry, UMG, Warner, and Sony, the notion that somehow that they would sign agreements and make representations and purport to own a 50% interest in something that was unlawful under Section 1101 would be unfathomable. I would just ask the Court to bear in mind that 1101 was established and came into law in 1994. Many of these concerts actually preceded that. That was one of my questions for you, actually. Have you argued that the statute is not even retroactive to the concerts before 1994? That is not in our brief, Your Honor. We did cite cases, including a case involving Flo and Eddie versus one of our clients here, Bell-Graham Archives, which actually takes you to the following conclusion that what the district court did here, to a degree, was pathological by combining both a performer class and a composer class in respect of the same recordings. In the Flo and Eddie case, you can't have the courts that you have to choose one tort versus another, and there's a good reason for it. Copyright subsists, as the panel well knows, in any original work of authorship once it's fixed into a tangible means of expression. If it's not fixed, then there can be no copyright infringement. So, in many respects, these particular torts grouped together in two particular classes really don't hold together. The other thing, Your Honor, I was about to mention is that not only can the consent be shown respecting what happened at the time, but also on the back end. If you take a look at Bill Sagan's declaration that he submitted, which is evidence, 4ER564, he details specific royalties that were paid by MediaNet, by Rights Agency, and the Performing Rights Society, CSAC, ASCAP, and BMI, all of whom have remitted monies to these performers, and there are issues regarding estoppel and waiver and consent on the back end as well. So, Your Honor, there are two specific areas that would call to the court's attention in response to your question. What I would say is that what happened... Does each individual band member have to give consent, or is the lead? How does that work? That's a great question, Your Honor, because that's one of the things that the district court failed to do, which was to define persons. What is persons? Is it the front man of the band? Is it the side man of the band? Is it the agent? Is it the manager? Our position, and there is testimony to this effect, even with regard to Class Rep Ken, and there are depositions that were referred to below from other cases, where the recordation of the particular performers was out in the open. It wasn't a secret. If you take a look at these cases, Mr. Ken himself acknowledged that, in fact, he saw that he was being recorded, and never at one point did he ever disavow any interest in that respect. Now, there are many other agreements with individual artists. I'm not going to mention those here, but they're on the record, and I could provide record sites, but in answer to your question, it would be on a... So, one of your arguments is that Ken himself has changed over time which of his performances he's asserting in this case. Can you explain what has changed when? Because it was very hard to follow in the briefs and records. Sure. So, Your Honor, what happened initially was that the Class Reps were pursuing a certification that included all performances that were played or used or copied by our clients, and that included both live performances at the concerts, together with studio performances and other performances that were considered to be non-live. And what happened was, before class was certified, the definition was reduced to take out studio performances because Ken had provided his consent to like seven years of that. They also had to change the class definition to avoid a fail-safe definition that would have implicated all unauthorized recordings, which, as Your Honor well knows, is a no-no in the Ninth Circuit. So, that's what they did. That doesn't detract from... But what about these King Biscuit recordings? Because those seem to be live and not studio, but I'm very confused. It doesn't seem like the district court included them, and I don't see you arguing, wait, that was a mistake. Those are live performances. I don't understand what's going on with the King Biscuit performance. I think the record regarding King Biscuit, this was a King Biscuit Flower Hour, which was a show many decades, a couple of decades ago. The bands would show up, there were agreements, and all that's been produced on, as you saw from the records. And these were live performances, but they were recorded through what they call a sound recording truck that appeared right outside of the at the time. And they were live performances, but I think the district court determined that somehow they were studio performances and should be excluded. But that's just one of many reasons that we would submit is problematic with the district court's order. The other thing is... Can I ask one question? The district court asked for supplemental briefing on whether or not consent is an affirmative defense or an element of a copyright claim. Is that correct? Is that relevant to the class certification question? I didn't understand that point. It really isn't, Your Honor. We take issue with the decision that she made with regard to who has the burden of demonstrating consent for the 1101 claims. But it really doesn't matter because under Rule 23 and the jurisprudence in this circuit, the court has to examine not only the claims but defenses, for which we provided at least some evidence. And I said just to Judge Freeland-Thru, we have submitted that particular evidence. The other thing I would say as I see my time is starting to wane... Do you think you've complied with true health, not that true health is distinguishable somehow? In order to avoid the debate, Your Honor, we believe we've complied with true health. We have the licenses from ASCAP, EMI, and CSAC. We have the joint exploitation agreements. We have the mechanical licenses from MediaNet, from RightsFlow, and from Section 115 compulsory licenses from Harry Fox. We've got testimony or statements that were made by the concert promoters and the sound engineers. And one of the things that the district court didn't focus on are all of what happened to all of the royalties that the class members received over years. Is that not susceptible to a particular defense that could be examined? We think it is wasn't mentioned. I was trying to figure out when you sought leave to bring this interlocutory appeal, it seemed like you were at least partially focused on the novelty of Section 1101 and who would have the burden and how this would be litigated. But then your brief wasn't really pressing this burden of proof argument now that you have the appeal. And I was trying to figure out why. Is that because you're just putting the eggs in the we've complied with true health basket? Well, your honor, I think there are a couple of points. Number one, 1101 is novel. There's never been any class that was certified for it. And there's good reason for it. The district court didn't even bother, you know, defining what persons actually was. But if you take a look at the statute, the statute says right on its face that in order to bring an action for tort itself, you've got to demonstrate that there was that it was a bootleg recording, that it was done without any consent or knowledge or agreement. But the district court said that was an affirmative defense. And I didn't see any argument in your briefing to us now saying, oh, no, that's not an affirmative defense. It's part of the plaintiff's claim or something else. You didn't contest that in your brief to us right now, I don't think. Yeah, your honor, we it's our brief does not specifically go far to be able to. I think we do make statements. I don't have a record site here and I apologize to the court. But I do think that we did take issue in our brief with regard to the district courts imposing the burden on us. We did not we did focus on commonality and typicality and predominance on the brief to be fair. The last thing I would say is I think I'm running over is that statutory damages here would be a complete mess of the as a panel will know statutory damages and copyright cases could go anywhere from 750 up to $30,000 and then enhance up to $150,000 per work. The district court said it's just paraphrasing. It's it's not a big deal. This can be done readily. I don't see how that could be done. Especially if you take into account the notion of willfulness, which is a very I think I need to cut you off because we're over time. And I imagine you might still want time for rebuttal. So yes, your honor. There we have you on that point. And let's hear from your opposing counsel. Good afternoon, may it please the court, Melissa Weiner. I am counsel on behalf of the seeking affirmance of the district court's grant of class certification. This is an important case involving some of the most famous musical performers and songwriters in history and seeks to protect misuse of proprietary artistic expression. appellees have demonstrated they can establish the prima facie elements of copyright infringement with common evidence. And the kitchen sink approach appellants have advanced things loudly as to the weakness of their defenses. appellants proffer hypothetical defenses of consent while ignoring this court's unambiguous holding in true health. The record evidence as to consent is finite and capable of class wide proof. Mr. Sagan swore under oath that all evidence relating to consent has been produced. appellants represented to the copyright office that the evidence of consent they possessed was in writing. I mean, just just to pause there. You know, consent can come in some different ways here. I think what I understood your opposing counsel to be arguing was essentially that we think these agreements we have justify what we did. But at the same time, when we're going to try this case, it's going to be highly individualized as to what any particular person consented to at the time a recording was made. And the recordings were made in many different venues by many different people over many different years. Respectfully, Your Honor, at class certification, what we are looking at is whether the evidence as a whole the evidence in the record and again, true health is controlling here, simply proffering hypothetical suggestions of consent or evidence that may come later. And we can talk in a minute about why it is highly unlikely that any of that evidence one exists, or two would even be admissible if it did exist. Also, we can talk about the point of oral consent and whether that is even proper, proper, proper here, which it is not. The first is that the evidence in the record that Mr. Elkin has referred to and that appellants have relied upon as to written consent is all common across the class. We do not need to determine at this stage whether that evidence of consent actually is legally enforceable. I can put a footnote that it has been held by a court to not be legally enforceable. Counsel, how could it be common? I guess he was saying that some of the agreements were sound engineers and promoters representing that they obtained consent from the artists as they recorded it. So each artist can say, yes, I agreed, or they could say, no, I didn't agree. So how is that a common proof? First, the law is that consent needs to be obtained at the time of fixation, that is the time of recording. And here, there is no evidence that there is any fixation or consent at the time of fixation. Why isn't the sound engineers or promoters representation that they got consent some evidence? So first, there is no evidence that any sound engineer has provided consent. So again, going back to true health, whether that evidence even exists, they have not met that burden. The second is that the law is clear that sound engineers could never contribute significant authorship to a concert recording because they do not make creative choices. And the Ninth Circuit and ABS versus CBS agreed that that does not rise to the level of authorship, which would appropriately give them the ability to consent. At least I thought Mr. Elkin's argument is that they obtained the consent on behalf of the artists and represented that to the appellants here. So it's not that the sound engineers are consenting to their own work or on behalf of, I mean, not consenting on behalf of the artists, but that they obtained the consent from the artists. There is no evidence in the record. What we keep going back to are what we have framed as three buckets of evidence that are in the record. There is nothing further. We have the acquisition agreements, all of which Judge Gonzales-Rogers found, and I'm sure your honors will see when you read them, have exactly substantially similar language with regard to a blanket statement of consent. Again, can those agreements be assessed class-wide as to the issue of whether consent was obtained? The second are those joint exploitation agreements, which were the result of litigation where the defendants here were being claimed to have infringed upon copyrights. Again, same blanket statement regarding having obtained consent, and simply that is not enough. The consent has to be... Oh, the bootlegging claim, the 1101 claim, that statute didn't even exist until 1994. I don't think, Mr. Kinn, your client has any recording from after 1994, as far as I can tell from all the lists in this case. So, how do we know that he even has a claim under that statute? So, this retroactive application of Section 1101, it has been held to be retroactive. I can give you a site. It's from NMR. If you just go to 3 NMR on Copyright at Section 8E.03. And the intent of the protocol was to afford retroactive protection to the bootlegs. Has any court held that? NMR is a treatise. So, do we know if a court has held that? I'm unaware of whether... As we know, many of these 1101 claims and what Judge Gonzales-Rogers went through detailed analysis on the statutory interpretation, a lot of these issues are before the court in the 1101 context as a bit of a novel issue. And again, we can get ourselves kind of wrapped up in all of these. I'd like to ask another question about Mr. Kinn's particular claims. So, can you explain what is going on with these King Biscuit recordings? Because as far as I can tell, they have been dropped because he actually made agreements giving consent, even if they were retroactive. Not because they were studio recordings, because they're not studio recordings. And that's at least my impression. So, if I'm wrong about that, can you correct me? The King Biscuit recordings have been excluded for purposes of refining the class definition. Because he consented to them, right? Because when looking at a class action and determining the best framework for class claims that can be evaluated with common evidence, the King Biscuit recordings did not fall within the case that we were prosecuting. And what aspect of the class definition shows us that the King Biscuit recordings are excluded? It was in the briefing, and Judge Gonzalez-Rogers, I don't have a cite, Your Honor. The class definition says non-studio, and the King Biscuit recordings are non-studio. So, I don't understand. It seems like in order to have your own client have a claim here, you've had to carve out things that he consented to. And yet, you want us to assume that every recording on the website was not consented to when your own client consented to some of them. And I'm just really struggling with how we can proceed on what you're asking us to assume when the plaintiff himself doesn't seem to be able to assume that about his own. The King Biscuit recordings were, many of them, studio performances. And there are trucks outside of venues. We have the venues listed. There are all these theaters that you can go to. They're not studios. We excluded the King Biscuit recordings because they were different than what we have seen with all of the agreements and all of the other live performances. But isn't the difference that he consented because they knew at the time they were going to be on the radio, we're allowing this to happen, right? That's because they consented. That's what makes them different? This was not an issue of whether we agree or state that there was consent. There were, as we, again, look at a class definition and whether any individualized issues as to particular groups of recordings, when we have agreements on the acquisition agreements and all of these separate agreements that we have reviewed and determined what fits within the class as to these bootleg performances, the King Biscuit recordings were different. What makes them different? What makes them different? The King Biscuit recordings where our client's interaction was different in that case than it was with the bootlegs and that there were... So if that's true, why, if that's true, then why should we assume that there aren't differences of the other things on the website? Well, our client did not consent to anything with King Biscuit. The signature is not from our client. This was a matter of identifying a group of works that was not exactly as the others. So why should we assume that all the other things on the website are exactly as the others? That's what you want us to assume in figuring out what this class is about. Because we have the universe of all of these documents related to the acquisition of these live performances. We have the joint exploitation agreements. And the only other agreements that exist are the agreements that fall into that third category, which we've called the one-off settlement agreements. And we have reviewed all of those and none of them, King Biscuit was different and we excluded it for that reason. It was a mix of studio performances and live performances, whereas all of the rest were bootleg live performances. So for purposes of refining the class definition, we excluded the King Biscuit recordings. I guess I'm still not sure why the agreements or the be-all and end-all of this issue of licensing consent. It seems like they are part of it. The defendants might take the position that ultimately they are correct on that. But if the case were actually to be tried between one performer and the defendant here, there's a whole chain of consent and license that happens in some cases over a period of decades. Why isn't the agreement just part of that overall question of licensing consent? What we have in writing, what exists, and again, Mr. Sagan testified, swore under oath, that everything with respect to consent is in the record. We have all of that. And there are no writings that satisfy the law on the issue of consent. But again, the issue of class certification is whether the evidence in the record is common to answer the question of whether consent can exist. And with respect to the evidence in the record and the agreements at issue, they all have substantially similar blanket language that confers consent. Now, as to your Honor's question about absent class member discovery or whether we could bring in a bunch of people at some later date and ask them retroactively whether they remember if they consented 50 years ago, not a scribble on a napkin, not a single declaration. By the way, these issues have existed in other litigation. In none of that other litigation, even when some record. So when you say other litigation, are you talking about litigation involving this same defendant? Yes, your Honor. Were those class actions? Were those class actions? The Abko litigation was, they got some limited class member discovery from many of the artists who were included in that action, and not a single one of them said that they had consented. But again, to look at whether that would be even possible to, for this idea of maintaining a claim under 1101, Wood and Judge Gonzales-Rogers pointed this out, essentially be requiring all of these individuals to prove a negative, that they didn't consent. And this is a class action where we are looking at the evidence, again, back to True Health, that is in the record, and whether this issue of consent that must be in writing or memorialized by a written instrument in order to be admissible. Counsel, if the artist brought these claims individually, wouldn't they have to prove consent or lack of consent in each of their claims, in each of their trials? Would they have to prove lack of consent? No, your Honor. Or disprove the affirmative defense of consent. No. So, and Judge Gonzales-Rogers went into a very detailed analysis in terms of the burden shifting here, and what it would actually require. That would be writing in an element to the statutes to require a person seeking to impose liability for copyright infringement to disprove, if there was an affirmative defense, that there was evidence to suggest that there was consent, that would, of course, have to be contested in litigation, of course. But here, to even rise to that level, we have no evidence of any consent on a class-wide basis or for these individuals in the class. I just don't understand why the 300 agreements that are, you know, that everyone agrees are in the record isn't some evidence of consent. It might not get you the whole way, but it is some evidence of consent. So, your Honor, again, backing up at class certification, and we don't have to answer that question. And whether those agreements, we, of course, submit that they are not evidence of consent. And also, another court has agreed that those exact same agreements are not evidence, legal, legally enforceable consent. But again, all we have to answer is whether the evidence in the record can be applied class-wide. And to the legal issue of whether they are even sufficient or appropriate, we can even take that next step and say that is not actually even legally enforceable consent, as it was not at the time of fixation. And it is not, it is hearsay, and they are just blanket proffering that they had consent at the time. And actually, if you look back at some of those agreements, they don't, some of them even state that they, you need to go further and make sure you get the appropriate licenses if you're going to exploit those works. It's not insignificant that not until after Bill Graham had, was deceased, that these recordings were exploited. They were never exploited for many, many years. We submit because all of the people, the concert promoters and producers who collected them, knew that they didn't have the requisite consent. The record labels get together and they have an agreement where they say, we have consent. By the way, carving out, they never said that they it is not insignificant. Most of those agreements never even sought to provide consent at all for some of the works at issue, like the audiovisual works. And it is curious that appellants have not even cited one time, it's not in the table of authorities, the true health decision. It is not an issue that we believe is even on appeal, that it has been waived, that it is their burden to establish an affirmative defense here. I guess though, I mean, I see your time is up. I don't know if Judge Freeland will permit me to Go ahead, keep asking if you have more questions. Even hearing you kind of make the argument, it sounds again like so much of this turns on knowledge and essentially what happened in individual relationships between performers and other people who were at a show and somebody who then bought the recording. I'm still struggling with why. You may be correct, ultimately, that in any given case, there wasn't consent, but I'm trying to imagine the class-wide trial on that issue. I'm having difficulty envisioning how it would be fair to the defendants to have forced them to sort of defend against so many different claims in one consolidated proceeding like that. Oh, the section 1101 specifically states that you need the consent of the performer or performers. And here that means we needed the written consent of all of the performers at the time of fixation. The appellants have had the opportunity to defend this case. They've had the opportunity to defend similar claims in other cases, and they haven't produced a single piece of evidence we submit that actually provides any of the required consent. Now, what we do have are all the only, Mr. Sagan testified, swore under oath, the only written consent that we do have is in the record. And all of that contains blanket statements that they had consent with not a single attestation attached. They haven't come forth with a single declaration. And oral consent under the law is simply not enough. Where are you getting that, though? I mean, 1101 doesn't say written consent. It just says without the consent. So, in terms of whether oral consent would have been sufficient, we have, sorry, just give me one second, Your Honor. In terms of whether it would ever be admissible to have oral consent, and it is consent at the time of fixation, and there is no evidence of that, it would have to be in some sort of a signed writing. An oral grant of copyright ownership is not valid. But 1101 isn't copyright ownership. It's a different right. So, I don't understand where you're getting this written consent as to 1101. I mean, Your Honor, even the Copyright Office, when the appellants attempted to copyright the bootlegs, which are the live performances, which would fall under 1101, the Copyright Office required written consent. And the appellants responded to the Copyright Office that they had written authority of the artist. That's on two supplemental exeter records, 84 and 91. So, what appellants have always maintained that they had in terms of consent was in writing, and all of the writings are in the record. I think we may need to cut you off there unless there are other questions. Okay. Let's give you two minutes for rebuttal. I just have a question just to get you started. Why aren't the agreements sufficient for purposes of trying the case on a class-wide basis? You're still on mute. I'm sorry, Your Honor. Thank you for that question. If we had to try the case on those agreements, then we certainly believe it is sufficient evidence, for the reasons that I attempted to mention earlier. There are many consents that are listed. We've got the agreements, the joint exploitation. We have sufficient, but I don't think there's any substitute, at least consistent with our client's due process rights, to be able to have discovery. I just want to say one thing. The judge below District Court, and we heard opposing counsel just mention that Mr. Sagan somehow testified that all issues related to consent had been provided, and that's all there is. That is so completely wrong, and I'm sorry to have to point this out, but the Sagan verification that keeps getting bandied about, which is SER 71, just doesn't say that. The dispositive language is on SER 73. Mr. Sagan was asked to test to basically provide a certification that he had produced all of the control. He never stated that this is the entirety of everything that exists, and of course that's not the case. So that's a mistake that keeps getting played back over and over again. Secondly, even under the copyright law, before you even go to 1101, the copyright law, the only time there is a specific writing requirement is under Section 106, when there's an actual transfer of one of the exclusive rights, like the exclusive right to publicly perform or the exclusive right to distribute. In all other instances, verbal consent or actions or implied consent is very much part of the landscape of copyright defenses. Thirdly, with regard to this prior litigation involving Santana and Grapeville-Denna, the major record companies, that involved Section 1101 claims. I litigated those. Those were bootlegging claims, and all of the artists consented to them. We had testimony. There's a reference to Santana already in that, and that's just... Were any of these other cases class actions? They were not. This was the only class action, and I would have to say, and I refer the court to Judge Lombard of the Second Circuit. This is what he referred to as the Frankenstein monster of class, disguised as a class action. Whether it's copyright ownership, statutory damages, consent, willfulness, you've got a cornucopia of issues here that cry out for individual examination. The other thing is, I know this has to do with co-authorship and not with regard to consent, but I believe opposing counsel made a mistake when she referred to the fact that a sound engineer or concert producer can only... Their contributions can't arise to the level of co-authorship. That's completely wrong, and we've got evidence in the record to demonstrate that these recordings were multi-track. If your honors were able to actually see the recordings, you would see these were very professionally done. The last thing I'll say is that oral consent and this hypothetical evidence, it's just not true. We have all of the licensing evidence with regard to the composer class that we haven't discussed, the compulsory licensing and the performer licensing on the publishers. All of that has to be cleared. All of that was done, and the fact that you could have 85% of the established music industry sign off on these recordings is really beyond belief. The other thing is that- Okay, I need to interrupt you. We're way over time, so thank you, counsel. Thank you both sides for the helpful arguments. This case is submitted, and we're adjourned from this panel, and we'll have continuation with a different panel in a few minutes.
judges: FRIEDLAND, BRESS, BUMATAY